Good morning. My name is John Young. I represent Hakim Rasul. Could you speak into the microphone, please? Just bring it closer to your mouth, if you can. My name is John Young. Thank you. I represent Hakim Rasul. There are only two bits of evidence in this case about Mr. Rasul, and what I'm looking for is something that would take this case beyond his mere presence. The two bits of evidence are the video recording, which is Exhibit 25, and the Court has that exhibit. The other piece of evidence is the testimony of cooperating co-defendant Patrick Hodges. The video recording is the mere presence evidence in this case. It does not show Mr. Rasul delivering bales of marijuana. It does not show Mr. Rasul loading bales of marijuana or wrapping or crating or anything like that. He shows him wearing gloves. He is wearing gloves. He shows him going in and picking some stuff up. He helps himself to a drink of water at one point. He sits on a wall. He wears gloves. He spends a lot of time watching his uncles. Or a car or something. He took a car and left. He initially came in one of his uncle's vehicles. But basically your case is, I mean, it has to be that the jury could not have believed Hodges, right? Because with Hodges, there was sufficient evidence. Really, nobody could have believed Hodges. Sorry, what? Really, nobody could have believed Hodges. But do we ever determine a credibility issue on sufficiency, turn a sufficiency question on our judgment that people couldn't believe him? I think so, yes. That was the point of the United States v. Earl case that I cite, that a witness's testimony can be insufficient based on that witness's lack of credibility. I think if we just say that as long as there is somebody testifying on the matter, as long as there's some evidence, that we get back into the some evidence, no evidence test. Well, ordinarily that's true, though, isn't it? If you have a witness testifying under oath that this person was carrying, loading bundles of marijuana and doing all the things that Hodges testified that he did, ordinarily that's sufficient by itself. And while the video doesn't add to that, it also doesn't detract from it. There's nothing in the video that's inconsistent with Hodges' testimony. In particular, wearing gloves on an 87-degree Tucson day is not really what a typical citizen would be doing. So there's nothing inconsistent. I guess I don't really see what you're asking us to do other than reweigh the evidence that the jury heard. I understand this Court's reluctance to retry a case. But language like usurping the function of the jury or retrying the credibility of a witness gets dangerously close to what Jackson v. Virginia was all about, which was a rejection of the previous no evidence versus some evidence test. But this person was not incredible because or if he was not credible or your assertion he was not credible, was not because there was anything inherently implausible about the story he told at trial. It was because of other things he'd said at other times, right? I mean, if somebody got up there and said, you know, the moon is blue, you'd say that's not credible and we're not, you couldn't rely on it. But he didn't say anything inherently implausible at trial. He just had said other things at other times about other things. Right. He lied when he was first arrested. Right, right. But his story at trial was a coherent, independently plausible story. Well, it was a narration of what was already in the videotape. So there's no way to say that the videotape corroborates him. He looked at the videotape and just narrated what he perceived to be happening. But if that's true, I mean, but with respect to your client, he, there was nothing he said that was off the wall in any way. You're just relying on the fact that he was, you know, for other reasons at other times told untruths. On many other occasions, on many other times, he told a series of untruths to Ms. McCallum, to all of the agents in the case. Right. When he came from New York to Tucson to free talk against my client, who was the only remaining person going to trial, he sat down and concocted an elaborate story about going to Phoenix for an All-Star game, that he came with a friend named Marlon Ormsby, that he stayed in a hotel there, that he ran into another friend, Leslie Enever, in Phoenix. All of it pure fabrication. Eventually, he was confronted with the fact that they had videotape of him at another previous February 11. The jury heard everything you've just recited. Yes. Through the impeachment of this witness. Yes. And yet, apparently, they believed his testimony, notwithstanding superb impeachment. No, sir, I would say apparently not. They did not believe his testimony. They convicted him of conspiracy. And I think they convicted him of conspiracy based on his mere presence at the scene. And because there was an enormously capable prosecutor on the case, they did not convict him of possession of marijuana. Had the videotape, had they believed Mr. Hodges, that Mr. Rasool had delivered the marijuana, that he had wrapped the marijuana, that he had crated the marijuana, that he loaded the marijuana, we couldn't have gotten around a conviction for possession. Well, maybe they gave him the benefit of the doubt precisely because of the video, because they didn't see it with their own eyes. So maybe he lucked out. But I guess I don't understand how that undermines the opportunity of the jury to believe that he was an integral part of this agreement to traffic in drugs. Well, I think that we cannot say certainly that the jury accepted that he did any of this stuff that Patrick Hodges talked about. The jury did not accept that and did not convict him of delivering these drugs or possessing these drugs or wrapping them or handling them or anything like that. The jury took a look at this case and convicted Mr. Rasool of being part of the conspiracy. With respect to gloves in Tucson, gloves, I think, whether you're merely present or not, that this would be obviously an excellent place not to leave your fingerprints. And likely he did not want to leave his fingerprints there because there was obviously illegality going on, but not necessarily because he was involved in it. His uncles may well have insisted that if he was going to be there that he put on a pair of gloves and not leave any fingerprints on anything. Mr. Rasool had no business there. He's a professional athlete, a basketball player at a minor league level. Not real bright and just should not have been there with his uncles who were in the marijuana trafficking business and had been doing this for years and were wrapping these bales and transporting these bales. He sat and he watched them. I know that Mr. Hodges said that Mr. Rasool left with a vehicle and came back with more bales or that bales were moved from the vehicle after Mr. Rasool came back. Or that he didn't. You really can't say one way or the other. Right, you can't say one way or the other. No. There is a particular instance that they looked at. Initially, the special agent who testified looked at the video and said that he could not tell whether any bales came back when Mr. Rasool came back with the Yukon. When he testified, he was more helpful to the government and he said that he thought that he could make out Mr. Rasool unloading a bale. When I look at Exhibit 25, it appears to me that what Mr. Rasool takes out of the Yukon, he drapes over one arm like a jacket and he closes the Yukon door with the other with his right hand, which is ungloved at the time, which does not have a glove on. It appears to me that he's getting a jacket out of the car or a shirt out of the car and not that he's loading bales of marijuana. If there are no further questions, I see that I'm just out of time now. Yes, thank you very much. Thank you. We will next hear from the government. May it please the Court. Erica McCallum from the District of Arizona on behalf of the government. This Court should affirm Defendant Rasool's conviction on the conspiracy count, because as the panel has noted today, there is abundant evidence to support that conviction. There is the possibility, given the fact that there was a hung jury on the position, that the evidence relied on was essentially the hanging around evidence. But in other words, it is troublesome, although I understand the case law says you don't necessarily rely on it, that some of the jurors were not willing to say that he actually possessed the marijuana, which seems to suggest that they thought that he never actually handled it, unless they thought that handling it wasn't possessing it. Of course, we can't read the mind of the jury as to why they were not able to reach a unanimous decision on that possession count. However, as far as an inconsistent verdict argument goes, the court, the reviewing court reviews the sufficiency of the evidence on each count independently. So and here it must be, it should be clear that the jury did not acquit Mr. Rasool on that possession count, but simply couldn't reach a unanimous decision on it. So looking at the Eriarty-Ortega case, acquittal on a possession charge does not affect the court's review of the sufficiency of the evidence as far as the conspiracy charge goes. Now, moving to the other defendants, and Hodges testified more generally, was it necessary to the convictions of the other co-defendants that Hodges believed? The other co-defendants had already entered plea agreements at the time of this trial. There were no other co-defendants. I'm sorry? There were no co-defendants. There were no co-defendants at the time of this trial, other than Mr. Eriarty. There were Hodges who testified. But I would like to address a couple of the issues raised by the appellant this morning. First of all, there's far more than just two pieces of evidence in this trial. In addition to Hodges' testimony, there was testimony by four government agents who were there on that particular day doing surveillance, observing that poll camera video in real time. And also there was documentary evidence. There were records of the crate, the wooden crate manufacturer that had received a series of orders from this particular organization over the past year for wooden crates that the marijuana is packed into. There was plenty of evidence that there was a marijuana conspiracy. The question is, what was this guy's role in it? And I would invite the Court to review the video. If it's not, it had an opportunity to do so. That has been provided as part of the record that came to this Court. I'm sorry. I'm not hearing you. Pardon? I didn't hear what you just said. I would invite you to review the video. The video doesn't show you much of anything. Well, the video shows the defendant moving the marijuana bundles, which corroborates It shows him moving something. There was an agent who was watching that video in real time. Yes, but he wasn't. I mean, all he could see was what anybody else could see. What he could see was, based on his experience, that the heft and the size of that bundle that was picked up was that it was a marijuana bundle. In addition, that bundle, the person who handed that bundle up into the load vehicle, that cargo truck, the truck then later was found. The wooden crates full of marijuana had been delivered to the warehouse. Those crates were found. Those bundles were found in the crates. And the truck itself was empty. There was nothing left in the truck. The defendant was seen putting that bundle up into the truck. The suggestion by defense counsel was that it was a jacket or a sweater, even though it was 87 degrees in Tucson that day. There was no jacket or sweater or anything else that could have been handed up by the defendant found in that truck. It had been emptied out. And where it had been was to deliver those crates to the warehouse. In addition, it's very significant that this defendant's conduct, when he arrived at the load-up site, he drove a co-defendant's truck in. He got out. He immediately went into another vehicle, took out an item. He then went into the Tahoe, which was the vehicle that transported those bundles to the load-up area. He took an item out of there. Within seven minutes, he had gotten behind the wheel of that Tahoe, driven it off-site by himself, and came back about an hour and 15 minutes later with that Tahoe loaded up with additional bundles. Now, we know that there were additional bundles both based on the testimony of Hodges and also based on the testimony of Agent Armstrong, who said the size of this load, 637 kilograms, it could not have been transported to that load-up area in a single Tahoe load. Which explains why the Tahoe arrived at about 1130 with a load of bundles. Those were emptied out. Seven minutes later, this defendant takes that Tahoe by himself, without anybody to show him where to go or tell him what to do, and comes back an hour later loaded up with additional bundles. So there's a lot of evidence to corroborate Hodges' testimony, and there is significant activity on that videotape, which is borne out by the testimony of the agents as well as by the records of the shipping warehouse and the records of the crate manufacturer, as well as it's very consistent with the video from the prior load of February 11th. Same color bundles, same shape, same heft, same modus of operation in that there was an SUV that had the bundles, which were then transferred into that same box truck and then delivered to the warehouse, corroborated by those warehouse records. So there is an abundance of evidence of the conspiracy and this defendant's connection to it, and all the government has to show is that he had a slight connection to it. The gloves are significant. The fact that this individual was familiar with every other person and spoke with every other person that was there on the day of his load, that he was trusted to drive that Tahoe independently, and also that he rode in the heat vehicle. When the loaded box truck and the heat vehicle, the Tahoe, left the load-up site to go to the warehouse to have the crates shipped, the defendant didn't stay behind at the dance hall at the load-up site. If he were merely present, then he wouldn't have gotten in the heat vehicle to ride with the other conspirators to pick up the box truck driver in that driver's switch that they had planned out. And in addition, the video shows that Mr. Rasool, the defendant, assisted in switching out that box truck's license plate. So the Texas plate was reversed and replaced with an Arizona temporary plate, and the testimony by the agents was that that was in order to reduce suspicion while it was traveling to the warehouse to deliver those crates. So to the extent that there's a conflict in the testimony, that the conflict should be resolved in the favor of the prosecution. To the extent that there is a question about Hodges' credibility, that is exclusively the province of the jury. So unless the Court has any further questions, I would like to rely on my brief and ask you to affirm. I think we have no further questions. Thank you very much, counsel. Mr. Young, you used up your time, but we asked you a lot of questions. If you'd like a minute for rebuttal, you may have it. Just very briefly, I'd like to point out that the government suggested that no jacket or sweater was ever found. There was never a search. That's why nothing was ever found. They never went back to the property and searched the dance hall or the outbuilding where they previously saw marijuana had been stored and the crates had been stored. The U-Haul that was at that property was never searched. The view that was at that property was never searched. So to say it was never found, it was because nobody ever went back and looked. And for all we know, the marijuana is still at that building or still in that U-Haul. They just never went back and looked for it. And not to belabor it, but it doesn't take three people to replace temporary tags on the back of a vehicle. His uncle Donald Thomas had that well in hand. He was the one with the screwdriver. Also present was Patrick Hodges, and Hakeem Rasool was standing there watching his uncle change the plates. He had something white in his hand, but no one could make out what it was. It could easily have been a newspaper. There just aren't enough pixels in the video to tell what it is we're looking at. But he's not helping to change the plates. It's not a three-person job to change the plates. And, in fact, he walks away and goes and sits on the wall before his uncle Donald Thomas is finished changing the plates. Thank you, counsel. Thank you. We appreciate the arguments. They've been very helpful. The case is submitted, and we'll take about a 10-minute recess before continuing. Thank you. All rise.
judges: Alarcon, Graber, Berzon